[No. 22523. Department One. August 26, 1930.]

PAUL FRIESE, *Appellant*, v. CITY OF EDMONDS *et al.*, *Respondents.*[1]

*O. Duncan Anderson,* for appellant.
*Alex McK. Vierhus,* for respondent.

TOLMAN, J.—Appellant, as plaintiff, brought this action to restrain the city of Edmonds and its officers from carrying out a certain contract set forth in the complaint and from making any expenditure of public funds thereunder. A demurrer to the plaintiff's

[1]Reported in 290 Pac. 856.

amended complaint was interposed and sustained. The plaintiff elected to stand on his complaint, and a judgment of dismissal followed, from which he has appealed.

The amended complaint, in addition to formal allegations, pleads that, on July 3, 1928, the council of the respondent city duly passed ordinance No. 404 providing for the acquiring, construction and maintenance of a municipal water works system for the city, and that the proposition be submitted to the voters for adoption or rejection. At a special election held for that purpose, the plan submitted by the ordinance was adopted by the voters, and that plan, in effect, is that the city acquire the necessary water rights, lands, springs, rights of way, reservoir, standpipe, sites, etc., for a municipal water works plant, the source of the water supply to consist of three or more wells, several hundred feet apart, to be located in the east central portion of the city; that special revenue water bonds in the sum of $130,000 and general bonds in the sum of $20,000 be issued, sold and the proceeds used in the purchase and construction of such a system. Thereafter the city proceeded in accordance with the terms of the ordinance and expended approximately $130,000 in constructing its diversion system; that it drilled two wells at an expense of $20,000, without obtaining an adequate supply of water, and that the city is now using water obtained from the site of a private owner which operated a private water system in the city prior to November, 1928, and that such source of supply is still available.

It is further pleaded that the city has long since expended all of the proceeds of the bonds authorized, and more, but from what source the excess was obtained does not appear. It is alleged that the city council had authorized the mayor and city clerk to enter into an

agreement on behalf of the city with the Pump Equipment Company, a corporation, and that the city officers did, accordingly, on December 27, 1929, enter into a written contract which is set out as an exhibit to the complaint. This contract, omitting formal parts, is as follows:

"That for and in consideration of the mutual promises and conveyances herein contained and the monthly rentals hereinafter designated, the parties hereto do mutually agree as follows:

"That the lessor does hereby agree to dig or drill, at the lessor's option, two wells for the discovery of water upon those two particular sites owned by the lessee and described as follows: (Description omitted)

"(1) (Description omitted) The lessor guarantees that the combined capacity of said wells shall be such amount as may be required by the lessee for its municipal water system, not exceeding, however, a maximum capacity of three hundred (300) gallons per minute. The lessor agrees that said wells shall be sunk by it within a period of 120 days after the date of this contract, excluding Sundays, full holidays or days when the weather or elements are such as would not permit the work and excluding delays on account of strikes; said period may be extended for such reasonable time as the parties may mutually agree upon. It is understood and agreed that in the event that said wells, after the expiration of said period or any reasonable extension thereof, or because of acts of God or forces beyond the lessor's control, do not produce required amount of water, that all liability of the parties hereto shall cease and this lease shall immediately become null and void and the liability of the lessor shall be limited entirely to the expense of attempting to produce said capacity. Should the water produced in said wells be of such quality as is not suitable for use for domestic purposes by the inhabitants of the lessee city, then this lease shall become null and void as above provided.

"(2) In the event water of sufficient quantity and quality is discovered in said wells, the lessor agrees to

install in and upon said wells two (2) Pomona Turbine pumps having a combined maximum capacity of three hundred (300) gallons per minute and capable of delivering water at that rate to the existing high reservoir in the city of Edmonds; also to furnish all necessary electrical appliances, including overload and undervoltage starter, time delay-relay, float switch, control wiring from the float to motors and B-X cable and conduit necessary to make the electrical hook-up from the motors to the various appliances and to construct concrete foundations for said pumps; also to furnish all labor necessary to install said pumps from the suction strainer in the bottoms of the wells to and including the pump discharge head and discharge outlet.

"(3) The lessee agrees to erect at its own expense, pump houses with concrete floors for the housing of said pumps, said concrete floors to be sufficient to carry the concrete foundations of the respective pumps; to furnish all valves, fittings and pipe and the labor necessary to run pipe from the pumps discharge outlet to the reservoir. The lessee further agrees to superintend during the entire term of the lease as hereinafter set forth, the proper oiling of said pumps and equipment by its water superintendent, who shall have been properly instructed in the care and maintenance of said pumps and equipment by the lessor and agrees that in the event of a breakdown or other failure of said pumping equipment to properly function, to immediately give notice thereof to the lessor, to the end that the latter may immediately remedy the trouble.

"(4) The lessee, the city of Edmonds, does hereby specifically agree to pay as a rental for said pumping equipment and the water produced thereby, the sum of one hundred and sixty-three dollars ($163) per month, commencing with the time when water is produced to the city's connection at the pump discharge outlet on the first well, and on the 10th day of each and every month thereafter for a period of five (5) years from the date of the first payment.

"The lessee further agrees to pay for all electric power used in the operation of said pumps and equipment during the entire term of this lease; also assign

and transfer to the lessor full title and interest in and to the twenty horse power Lane & Boler turbine pump with all electrical appliances now appurtenant thereto as part of the consideration for this lease.

"(5) The lessor guarantees said pumps and equipment against all defects in material and workmanship, and the labor necessary for the repair or installation of repair parts for the first year in the term of this lease, and to furnish to the lessee a good and sufficient bond in the penal sum of $2,500 conditioned upon the full and faithful performance of this contract, and in the payment of all labor, mechanic's and subcontractors and material men and all persons who shall supply provisions· or supplies for the carrying on of any of the work in connection with this contract. Said bond to run for the first year of the term of this lease. It is understood and agreed that the lessee will assume and pay for and be responsible for the operation and maintenance of said pumps and equipment from and after the expiration of the first year under this lease, and that the lessor shall pay no ground rental for the use of the above described sites during the period of this lease. City of Edmonds to pay premiums on said bond.

"(6) At the end of the term of this lease and the completion of the payments herein above specified, the lessee may at its option purchase said pumps and equipment for the sum of $100; title in said pumps and equipment to remain entirely in the lessor, its successors or assigns, during the entire term of this lease and until said option shall have been exercised by the lessee."

It is charged that the execution of this contract is irregular, fraudulent and void in that, while denominated a lease contract, it is in truth and in fact an attempt to contract for the drilling of two or more wells at an additional cost of $10,000 in excess of the $160,000 already expended for the construction of the proposed water system; such excess sum never having been authorized by the voters.

It is also pleaded that the execution of this contract was without notice, and that it was, in legal effect, the letting of a contract or the purchasing of property without calling for bids as the law requires, and that it called for an expenditure of more than $500, and should, if entered into at all, be let to the lowest bidder. The complaint also alleges that the equipment to be installed by the lessor, so-called, under the contract will, with ordinary care and use, have a value at the end of the five-year period covered by the contract of approximately $4,000.

The facts being admitted by the demurrer, our task here is to place a proper construction upon the contract, all of the essential terms of which we have set out in full. It is apparent that the voters have approved the plan of procuring water by means of wells, but they have not approved of the expenditure of anything more than $150,000 in completing the project.

The question then is, Is the city now obligating itself and, in legal effect, expending in round numbers $10,000, or, is it, by means of this contract, obligating itself only to pay $163 on the tenth day of the month following the furnishing to it, by respondent Pump Equipment Company, of water as specified in the contract?

There are a multitude of authorities which seem to have more or less bearing upon the question, but, when the subject is carefully analyzed and the dividing line discovered, it at once becomes apparent that but few of the decided cases offer us any help. As fair a statement of the law, and of the dividing line between what may and may not be done, as has come to our notice, is as follows:

"In a majority of jurisdictions it is held that a contract by a municipality to pay for water, lights, sewerage, and the like, at stated times in the future, does not

create an indebtedness within the meaning of a provision limiting the indebtedness of municipalities, or, if it does create an indebtedness, it is one only for the amount of the payment or payments due the first year, and not for the aggregate amount of all the payments; but in a few jurisdictions such a contract is deemed to create a debt for the aggregate amount of the payments, within the meaning of limitations of the amount of indebtedness. On the other hand, a contract for the purchase or construction of a public utility plant or for the purchase of other property, the consideration being received in the present and all at one time, creates an indebtedness for the full amount of the contract price, notwithstanding the price is to be paid in installments during a series of years or an attempt is made to avoid a debt limitation by contracting in form to pay rental." 44 C. J. 1130.

Of course, appellant argues that the consideration is here received by the city in the present and all at one time, but does the contract so provide?

The lessor (the pump company) agrees to construct at its own expense two wells for the discovery and production of water upon the lands of the city. The wells, if sufficient water is not produced, remain its property, and all of the casing and other parts removable may be by it removed and the salvage will belong to it alone. This would seem to be true throughout the whole term, and if the water at any time fails, the rental ceases, the lessor is entitled to all salvage, the city taking nothing.

While the wells are to be upon the land of the city, still they are not a valuable appurtenance until water is produced. A dry hole would be of no benefit to the land, nor would it have any salvage value. It would be a total loss, but to whom? To the pump company, of course, because its money had been used and lost.

So, clearly, in the event of the failure to produce the necessary water, the city loses nothing more than the

temporary use of the well sites which is not shown to be of any value. And, since the city loses nothing, that of itself demonstrates that it has received nothing.

But, if sufficient water to comply with the contract is thus produced, the necessary equipment to make that water available must be supplied by the pump company at its own expense. We are not informed by the complaint as to what that expense will be, though we may infer that it will be a substantial sum. It is nowhere suggested that $163 a month is not a reasonable amount to be paid by the city to the pump company, under these peculiar conditions, for the services rendered in producing the water and as income upon its expenditure in drilling and equipping the wells. In the absence of facts showing the contrary, the presumption must be that the rental, so-called, is but a fair rent upon the investment, coupled with the risk of the pump company.

That the city must operate the pumps at its own expense, if water is produced, is nothing more than that which devolves upon all lessees and tenants, and that it must build pump houses, etc., is the equivalent of the common practice of permitting a tenant to improve leased property for his own advantage and enjoyment. But, of course, the obligation to operate is only contemporaneous with the production of water, and if the wells fail to produce, the obligation to operate immediately ceases; so, also, the rental.

If the wells never produce, the rental never becomes payable, and if and so long only as they do produce, the rental is payable on the tenth day of each succeeding month for the term of the lease. Clearly, here also, all benefits to be received by the city are future benefits receivable only as water is produced.

The only at all inconsistent provision of the lease is the last one quoted, giving the city the right to pur-

chase the equipment at the end of the term for $100, which, coupled with the allegation that, with reasonable use, the equipment will then be worth $4,000, has caused us serious trouble.

All of the other provisions of the lease, as we have seen, clearly indicate that the city is receiving at the present time nothing but the bare right to take the water if, and when, it is produced upon payment of the monthly charge. Must we then assume that the last provision overrides all that precedes it? No authority is cited which so holds, and we think it would be arbitrary, indeed, to so decide. There is no law which compels a vendor, against his will, to demand and accept no less than the full value of his property, and one, being solvent, may give away his property, if he desires, even to a municipal corporation. Perhaps, if it appeared that the monthly rental of $163 was grossly in excess of the value of the service rendered and the risk assumed, we might hold that it was, in fact, but an installment of the purchase price and that the intent from the beginning was to contract with the city for a consideration of $10,000 to be paid in installments. But, in the absence of any such allegation, we cannot so hold.

When the facts are carefully considered, we think the authorities upon which the appellant relies are clearly distinguishable, and that this case is governed by the first part of the rule already quoted and by *Walla Walla City v. Walla Walla Water Co.,* 172 U. S. 1, 19 Sup. Ct. 77; *Keihl v. City of South Bend,* 76 Fed. 921. See, also, *Note to Hagan v. Commissioners' Court,* 37 L. R. A. (N. S.) 1062.

If we are right upon the question already discussed, then there was here no need to call for competitive bids under Rem. Comp. Stat., § 9145, because the city's

liability at any one time cannot exceed the monthly rental of $163.

The judgment is affirmed.

MITCHELL, C. J., PARKER, BEALS, and MILLARD, JJ., concur.